John L. HAHN, (Plaintiff) Respondent,

v.

**FLAT RIVER ICE & COLD STORAGE COMPANY, a Corporation, (Defendant) Appellant.**

No. 44725.

Supreme Court of Missouri.

Division No. 1.

Dec. 12, 1955.

Motion for Rehearing or to Transfer to Court en Banc Denied Jan. 9, 1956.

· Raymond S. Roberts, Roberts & Roberts, Farmington and John F. Evans, Evans & Dixon, St. Louis, for appellant.

J. B. Schnapp, Fredericktown, and Edward V. Sweeney, Monett, for respondent.

HYDE, Judge.

Action for damages for personal injuries. Verdict and judgment for plaintiff for $25,000, and defendant has appealed. The principal questions are whether plaintiff's evidence was sufficient to show that defendant was negligent and whether plaintiff was negligent as a matter of law.

Plaintiff lost his right hand in an ice crushing machine. He said his hand was caught when he reached into a chute in the bottom of the machine to unclog ice that would not fall out. The case was submitted on three charges of negligence, as follows:

"(b) In failing to provide any or suitable tools or equipment for use by operators of said ice crusher in removing ·collected ice from the chute of said machine so as to enable them to remove said ice without placing any part of their body in a position dangerously close to the crushing and grinding mechanism. ·

"(d) In failing to warn the plaintiff and other persons using said machine of the location of the grinding mechanism of said machine, and of the danger of the users coming into contact therewith when reaching into the chute of the machine to remove ice collected therein.

"(g) In instructing and directing plaintiff to insert his hand into the machine to remove ice therefrom when they knew or in the exercise of ordinary care could have known that plaintiff could not do so with reasonable safety."

Plaintiff purchased ice from defendant and sold it to customers on a route he had served since 1945. He was injured in June 1951 and was 71 years old at the time of the trial in September 1954. He sold both block ice and crushed ice on his route and was in defendant's plant several times a day in the summer. In 1945 defendant had an old ice crushing machine which plaintiff frequently operated when defendant's manager and engineers were present and no one objected to his running this machine. In July 1949, defendant installed a new ice crushing machine and one of defendant's engineers showed him how to start this machine and operate it. Plaintiff did operate it almost every day except on Sunday during the summers for about two years before he was injured. He usually delivered only block ice in the mornings and would crush ice in the evening. Plaintiff offered in evidence a photograph of this machine, from which it appears there was a hopper at the top into which blocks of ice were lifted by means of an elevator on the side of the machine. Also at the top, just below the hopper, there was a revolving drum with spikes or claws which pulled the ice in from the hopper and broke it up. These moving parts (the grinder) were completely enclosed by metal sides. The machine could be adjusted to grind coarse, medium or fine. Below the enclosed moving parts and above the receiving bin, into which crushed ice dropped, there was an open space across the entire width of the machine. We refer to the side of the machine where this opening was as the front of the machine (this open space was enclosed on the other three sides) and we

note there was an iron ledge or beam above this open space which supported the enclosed moving parts and hopper. Also below the open space and below the receiving bin there were two doors in the front of the machine which could be adjusted to make a wider or narrower opening for the ice to fall out. (A plaintiff's witness said the usual opening was 10 or 12 inches.) There were chutes, running down from the receiving bin to these doors, which plaintiff said were 12 or 14 inches long. When the machine was running, the crushed ice would fall from the enclosed grinder through the open space, below these enclosed moving parts, into the receiving bin and then slide through the chutes and out of the doors. On the front of the machine, below the doors of the chutes, there were curved metal bars on to which ice sacks (about 3½ feet long) could be hooked to receive the ice from the chutes. The machine stood on legs about the length of the ice bags. The machine was operated by electricity and the switch controlling it was on the wall six or eight feet from the machine.

Plaintiff said the ice would clog in the chutes and it was necessary to reach in the doors with his hand to drag out the ice. He said defendant's manager and engineers did this in his presence when they operated the machine; that he did so many times in their presence during the two years before he was injured; and that he had seen other ice customers do so in their presence. He said the engineer who showed him how to operate this machine when it was first installed demonstrated to him how to drag out ice by reaching his hand "in that chute where the ice comes down from the crusher." He said: "It was the only way you could get it out of there. It clogged up in there and backed up into the machine, back into the grinder. * * * In warmer weather it would clog up a whole lot worse because it gets clammy. * * * When it got too full, it would fall out on the floor." (Apparently, from the open space above the bin.) Plaintiff said there were never any tools or utensils furnished for use in removing the clogged ice; that there were no notices posted warning customers against the

practice of reaching into the chute to drag out ice; and that neither defendant's manager nor engineers ever warned him or other ice customers that the practice was dangerous. However, the engineer when showing him how to operate the machine told plaintiff "to be awful careful about the top, it was dangerous." Plaintiff said sometimes the machine would not catch the ice blocks in the hopper and "you would have to get up there with an icepick or something to chop it up and get the crusher to take hold of it." He said: "I didn't know about the bottom end of it. I was afraid of the top of it all the time. * * * I had looked in the top of it, had to lots of times to break up the ice."

He further testified:

"Q. You could see down in the machine? A. Could see the top of it where it was running there, yes.

"Q. And that would show this drum with these jiggers or spikes on them, is that right? A. Spikes, yes.

"Q. How long were they, Mr. Hahn? A. I think they was between three inches, between two-and-a-half to three inches, something like that.

"Q. You mean that stuck out from the drum? A. That was kind of a hook-shape, you know.

"Q. That clawed the ice? A. That is right.

"Q. They were fastened to a center drum, were they, that revolved? A. That is right.

"Q. You have seen that revolving many times? A. Yes, sir.

"Q. Now, you said whoever it was that showed you how to operate it had warned you about the upper part of the machine where the grinder was? A. Yes, sir.

"Q. is that right? A. He did. * *

"Q. Now, down in this bin here where the ice dropped down in there where you say it clogged up, there wasn't any moving parts down there, Mr. Hahn? A. No.

"Q. The only moving part that you know of in that machine was this moving drum around there, is that right? A. That is right."

Defendant offered no evidence except the measurements of the machine and photographs of the machine which were identified by plaintiff on cross-examination and introduced in connection therewith. Plaintiff had two witnesses who were ice customers of defendant and who corroborated his testimony as to the methods used in getting crushed ice.

On the day plaintiff was injured he went to the office and purchased a ticket from the manager for 600 lbs. of ice. Plaintiff gave the ticket to the engineer in the room where the machine was and he gave him the ice but told plaintiff he would have to crush it himself. (The engineer "was working on the pump or something.") Plaintiff had ground two sacks of ice and was working on the third and was standing "straight up" in front of the ice bag. The ice was collecting in the chute and he reached in the chute to rake out the ice with his hand. He was asked if he reached in as far as his elbow and answered: "I don't know whether it could have been or not." (Plaintiff testified that the measurement from the break of his elbow to the tips of his fingers was 18½ inches. Defendant's measurement from the corner of the chute to the nearest moving parts of the machine was 17 inches and this seems more favorable to plaintiff than his own estimate that the chute alone was 12 or 14 inches long.) Plaintiff said while he was raking the ice out of the chute something hit his finger, kept jerking his finger, catching his hand "and pulling it a little bit at a time." He said: "It was whatever that drum there, whatever this jigger was, what caught my hand. It was the cylinder that revolved on that thing." After plaintiff's hand was caught, the engineer came back into the room and turned off the switch, which plaintiff was unable to reach.

It is obvious from the photograph of the machine introduced by plaintiff, as well as

the other photographs identified by him and all of his evidence, that his hand could not have been near the moving parts or in any danger from them while in the outlet chute or even in the enclosed part of the receiving bin above the chutes. It would only be possible for a man's hand to come in contact with the moving parts of the machine either by reaching directly into and above the open space in the front of the machine (above the enclosed receiving bin) or by reaching up and completely through the outlet chute, through the receiving bin and through the open space above the bin. Plaintiff's testimony was that he was reaching up through the chute (and not reaching directly into the open space above the bin) and it is difficult to understand why in raking ice from the chute or from the bin, he would reach completely through the chute on above the enclosed part of the bin into and through the open space to the enclosed moving parts, since the ice fell from the grinder into the bin by force of gravity. Plaintiff had operated this machine almost two years, knew what was in the enclosed top part and knew it was dangerous. When the ice was raked out of the chute and the bin, there would certainly be no ice in the open space above the bin. There was nothing in the evidence to show there was any danger from the moving parts of the machine to one whose hand was in the chute or in the bin below the open space or even until one reached through the open space above the bin. We cannot see any reason for doing that in unclogging the chutes or how anyone in the exercise of any care would do so, particularly one who had operated the machine for almost two years.

Plaintiff cites Longacre v. Farmers' Elevator, Mercantile & Mfg. Co., Mo.App., 246 S.W. 632, where the plaintiff's hand was injured reaching into a chute leading from a corn sheller. (Plaintiff, an employee of defendant, used the same method his foreman used.) However, in that case, one charge of negligence was improper construction of the chute, by having the discharge end of the chute higher than the receiving end at the sheller so that the force of gravity could not aid in preventing clogs, which was certainly not true in this case where the ice dropped straight down from the grinder into the bin and the chutes were slanted down from the bin. Moreover, in that case, there were moving parts of the machinery at the receiving end of the chute, which was likewise not true in this case. In this case, there was no danger in the use of one's hand to rake out ice from the chute as long as it was in the chute, or even while it was in the enclosed bin above the chute. It was only by raising one's hand through the open space above the bin that there was danger of coming in contact with the moving parts and, as we have said, the evidence does not show there could be any reason to do that for the purpose of unclogging the chutes, which plaintiff says was what he was doing. His evidence shows that the clogging was in the chute and it also shows that the chute was the only place plaintiff ever saw anyone put his hand to unclog ice or was told by anyone to put his hand for that purpose. Clearly there could be no ice clogging in the open space above the bin after the chutes were unclogged and the bin cleared because the crushed ice fell through that space into the bin by force of gravity. Of course, plaintiff could have reached directly into the open space and down into the bin to push ice down the chute. However, he said he was not doing that, but instead was reaching up through the chute, so that a failure to have a guard over the open space could not have been a proximate cause and, no doubt, for that reason the charge of negligence made herein of failing to have a guard was abandoned.

Plaintiff also cites Allis Chalmers Mfg. Co. v. Wichman, 8 Cir., 220 F.2d 426, 427, which states the rule in this state, as follows: "But the Missouri decisions seem to us to indicate generally that where one relies and acts upon the directions and assurances given him by another as to the proper manner of performing a task or operation, in relation to which the latter legally can be said to owe him some duty as to his safety, it ordinarily is a question for the jury to resolve whether the directions and assurances given were improper and such as to amount to negligence in the par-

ticular circumstances, and also whether the reliance upon and following out of them in the situation involved constituted contributory negligence." In that case, the plaintiff's hand was carried into the rollers of a hay-baling machine when he followed a method of pushing twine into the rollers, which he said had been told and shown by the manufacturer's demonstration representative. However, in that case also, the method was one which required the plaintiff's hand to be placed very close to the moving rollers, while in this case, as we have noted, using one's hand in the chute to drag out ice could not cause it to come close to the moving parts, but that, to do so, it was necessary to reach beyond the chute through the bin and through the open space above it. The other cases hereinafter set out, cited by plaintiff, while they involve the principles stated in the Allis Chalmers case, hereinabove quoted, 220 F.2d, loc. cit. 427, involve very different fact situations. Zuber v. Clarkson Const. Co., 363 Mo. 352, 251 S.W.2d 52; Spurlock v. Union Finance Co., 363 Mo. 62, 248 S.W.2d 578; Bartlett v. Taylor, 351 Mo. 1060, 174 S.W.2d 844; Nagy v. St. Louis Car Co., Mo.Sup., 37 S.W.2d 513; Streicher v. Mercantile Trust Co., Mo.Sup., 31 S.W.2d 1065; Macklin v. Fogel Const. Co., 326 Mo. 38, 31 S.W.2d 14; Ford v. Dickinson, 280 Mo. 206, 217 S.W. 294. Our conclusion is that plaintiff's evidence is not sufficient to prove the charges of negligence submitted because it shows that one's hand could not come in contact with the moving parts of the machine by reaching into or even completely through the chute, but instead one would have to reach beyond the chute and the bin above it and through the open space above the bin. There is no evidence that any of defendant's employees ever reached beyond the chute to unclog ice or even suggested to plaintiff to do so. Thus the evidence fails to show any reasonable basis for the defendant to have anticipated that a person of plaintiff's age and experience, reaching into the chute to unclog ice, would extend his arm so far beyond it as to come in contact with the moving parts of the machine.

We think it is also true that plaintiff was guilty of contributory negligence as a matter of law, on his own account of the occurrence, and so hold. As we have pointed out, in unclogging a chute there was no reason for plaintiff to reach so far through the chute as to bring his hand in contact with the moving parts of the machine above the bin and above the open space over the bin. It could serve no reasonable purpose of unclogging ice in the chute to reach his hand that far beyond the chute. Plaintiff knew where these moving parts were and even a casual view of the machine would clearly indicate where they were. One of plaintiff's witnesses testified as follows: "Q. Mr. Gallagher, Mr. Schnapp asked you if anybody had ever warned you about that machine. Anybody that saw it work knew where the moving parts were, didn't he? A. Sure, they would know." We think the situation here is very similar to that in two recent cases in which we held plaintiffs guilty of contributory negligence as a matter of law. Crandall v. McGilvray, Mo.Sup., 270 S.W.2d 793; Chisenall v. Thompson, 363 Mo. 538, 252 S.W.2d 335. In each of these cases, the plaintiff used an unsafe method of unclogging the machine involved (a corn picker) when he knew there was a safe method to do it. Plaintiff herein argues that in those cases warning signs were violated, while in this case he used the method shown him. However, his own evidence was that the method he was shown was to rake the ice out of the chute with his hand. All of his evidence also shows his hand could not have been injured while it was in the chute or even if he reached it into the enclosed part of the bin above it. Thus, it is apparent that plaintiff was doing something more and different from anything that had been demonstrated to him as a method of unclogging ice in the chute. Surely the clogged ice must have been removed from the chute, at the time he reached so far through it and above it, or his arm could not have gone through it to such an extent. Undoubtedly, it was negligence to reach so far beyond the chute. Certainly, plaintiff had operated this machine long enough and often enough to

know that it was not safe to reach his hand beyond the bin through the open space above it in the manner described in his testimony.

The judgment is reversed.

All concur.