Ralph BECKETT, Plaintiff-Respondent,

v.

Harold KIEPE, Defendant-Appellant.

No. 23767.

Kansas City Court of Appeals. Missouri.

June 3, 1963.

Warren D. Welliver, H. F. (Pat) Patterson, Columbia, Clyde E. Rogers, Fayette, for appellant.

W. F. Daniels, Fayette, for respondent.

BROADDUS, Presiding Judge.

This is an action for damages for personal injuries. A jury trial resulted in a verdict for plaintiff in the sum of $3,555. Defendant has appealed.

Plaintiff, Ralph Beckett, a 46 year old farmer, entered into a contract whereby the defendant, Harold Kiepe, agreed to furnish all material and to construct a pole barn on the Beckett farm at a total contract price of $3,000. The barn was to be 51′ x 60′ with a 30 foot clear span.

Construction of this sort of building is accomplished by taking a post hole digging machine and drilling holes at regular spaced intervals around the outside perimeter of the building, spaced about 5 feet apart and about 5 feet in depth. Creosoted poles in the nature of telephone poles are then set upright in each hole, standing loose in the hole. The roof-rafter frame is assembled and as this is done each pole is straightened into an upright vertical position and then nailed and fastened into place, the completed assembly constituting the frame of the building. The holes in which the upright poles are standing are then filled around the poles and the entire frame of the building, roof and sides are covered with tin or some sort of metal siding. The accident in question happened during construction of the frame of plaintiff's barn, when defendant Kiepe and his two employees, Scheibly and Andrews, were working on top fastening the roof rafters and frame together.

Defendant Kiepe testified that the normal procedure used for straightening and aligning the poles into vertical position as you fastened and nailed the frame together was to take a 14 to 16 foot 2 x 4 and to lean it against the creosoted upright pole which you desired to push over into a vertical position. He said that you would then push down on the middle of the 2 x 4 causing it to bend or arch downward in the middle, and that as you released the downward force, the 2 x 4 would try to spring back and straighten and the lower end would "bite" into the ground and the upper end would "bite" into the creosoted pole and the force would thereby cause the top of the vertical pole to be pushed into the desired position. This was normal accepted practice, and he had done it on a thousand poles.

During the construction, at about 2:15 on the afternoon of November 25, 1960,

plaintiff walked from his house up to where they were building the barn in order to watch the construction. Plaintiff said he was naturally interested and wanted to see how they were getting along. The son of one of the defendant's employees, the Andrews boy, was sitting around there with the plaintiff. Plaintiff stated that another employee of the defendant, Wayne Scheibly, asked him to help line up one of the poles. Plaintiff told him. "I'll help if I can", and Scheibly told him to pick up the 2 x 4 laying on the ground and lean it up against the pole. The 2 x 4 was 14 to 16 feet long. Plaintiff said that he asked Kiepe, "Isn't that kind of dangerous for me to line that up like he wants me to by getting up on it like that?" and Mr. Kiepe had answered him, "We have done it before." Plaintiff then stated that he "got up on the pole at his request and tried to ride it down, but it didn't seem to go." He then stated that, "he (Kiepe) asked me if I would slip under it and see if I could pull, and I just turned it over and tried to pull on the pole and I just supposed that he (Kiepe) knew what he was doing, so at that time, why the thing fell, went sideways, and I had my feet tucked under me and I fell and broke my ankle."

Both defendant Kiepe and his employee Scheibly said that Scheibly had asked Beckett if he would give a hand in straightening the pole, but Kiepe said that he had only told Beckett to push down on the 2 x 4 not get under the 2 x 4. Kiepe said that he did not ask anyone to get under the 2 x 4 and pull down on it because a 2 x 4 leaning at an angle would not hold a man's weight, and was too close to the ground. Kiepe said that leaning the 2 x 4 against a creosoted pole and getting under it and pulling down was like getting on a limb and sawing it off, but that pushing down on it from the top didn't involve much more risk than mashing a toe if it slipped off. Kiepe said that a man couldn't climb on top of the 2 x 4 because it wouldn't hold his weight, and because the big bend or arch in it would make it too steep to climb. Kiepe said that he

had previously used the procedure of pushing down on a 2 x 4 on a thousand poles.

Plaintiff came back on rebuttal and again stated that defendant Kiepe had asked him to get under the 2 x 4 and pull down on it, after Scheibly had testified that Kiepe had not told him to get under it. Both Scheibly and Kiepe testified that Beckett did get under the 2 x 4 and pull down while Kiepe had his back turned toward him and that Kiepe had turned and noticed it and had hollered "Look out Ralph", but that he didn't have time to stop him before he fell. Both Scheibly and Kiepe saw Beckett fall.

It is undisputed that plaintiff sustained a broken ankle and no claim is made that the verdict is excessive.

■ Defendant's first contention is that the court erred in refusing to direct a verdict in his favor. Defendant asserts that because plaintiff was not an employee, he cannot recover; that plaintiff was a mere volunteer; that no duty was owed by defendant to plaintiff. In short, that there is no possible theory of recovery in the instant case.

The cases hold that there is a common law duty on the defendant to exercise ordinary care with reference to the *method adopted and employed* for the transaction of defendant's business. Miller v. F. W. Woolworth Co., 328 S.W.2d 684 (Mo.Sup.)

Defendant claims that because plaintiff was not an employee or servant such principle is not applicable. This contention is answered by Daugherty v. Spuck Iron and Foundry Co., 175 S.W.2d 45, (Mo.App.), wherein plaintiff was employed by a trucking firm and went to defendant's foundry to pick up some castings; defendant's foreman directed plaintiff to back his truck into defendant's building; that the foreman asked plaintiff to help some of defendant's employees load some castings on the truck and plaintiff and one of defendant's employees would then move the castings forward in the truck by "walking" the casting

(each moving one end at a time); that defendant's foreman was directing this operation; and as a casting was moved about 10 feet, plaintiff's helper (defendant's employee) turned loose of the casting while it was off balance and it fell on plaintiff's leg. Defendant's foreman denied that he asked plaintiff to help with the casting. Other employees of defendant testified that they did not hear anyone ask or direct plaintiff to help.

The court held loc. cit. 49, that whether or not defendant's foreman invited plaintiff to assist in loading the casting or whether plaintiff was a volunteer, were questions of disputed fact (as in the case at bar, where plaintiff says defendant asked and directed him to pull down on the 2x4 and defendant denies the same).

The court then stated loc. cit. 49: "It was not necessary, to defendant's liability in this case for plaintiff to prove that he was or became a servant of defendant. The evidence was clearly sufficient, however, to show that plaintiff was not a mere volunteer or trespasser, or a licensee, but that *he was lawfully on defendant's premises on business of mutual interest to defendant and himself and occupied the status of an invitee to whom defendant and its servants owed the duty of exercising ordinary care to avoid causing him injury while he remained on the premises on such business."* (Emphasis ours.)

It is unquestioned that plaintiff in the instant case, was on his own land, where plaintiff had a right to be. Also, it is not controverted that defendant or his employees requested and asked plaintiff to help out in lining up the pole. Plaintiff was, therefore, not a "volunteer" in any respect.

In the case of Fletcher v. Kemp, 327 S.W. 2d 178 (Mo.Sup.), plaintiff, a welder, was injured by a welding drum. Plaintiff was employed by one Martin, who leased a filling station and equipment from defendant and Martin told plaintiff to help defendant weld an angle iron on a drum. Defendant told plaintiff where to put the angle iron. De-

fendant contended that plaintiff was a volunteer, that no master and servant relationship existed between plaintiff and defendant; that a relationship of invitor and invitee did not exist. So, that defendant owed plaintiff no duty. The very argument that defendant is making in the case at bar.

The court held in overruling defendant, loc. cit. 182 (citing 65 C.J.S. Negligence § 62), that plaintiff was not a volunteer, plaintiff was where he had a right to be; he was invited by defendant, as well as directed by his employer, to assist defendant in doing the work. It was not done of his own free will and not the act of an intermeddling bystander. Defendant directed him as to the particular welding to be done. *"Accordingly, the case falls within the rule that a duty to exercise ordinary care is imposed upon one who invites another to assist in an operation."* (Emphasis ours.)

In view of the above authorities, we are of the opinion that plaintiff made a submissible case.

 Defendant next contends that plaintiff was guilty of contributory negligence or he assumed the risk as a matter of law.

The doctrine of assumption of risk may extend to other cases than master and servant and the doctrine is that one who voluntarily exposes himself to a known and appreciated danger due to the negligence of another may not recover for an injury resulting from such exposure. However, to invoke the doctrine it is necessary that the exposure to the risk shall have been *voluntary.* Fletcher v. Kemp, supra, loc. cit. 183. It has no application where the injured person surrenders his better judgment as a result of an assurance of safety (as defendant saying, "We have done it before.")

As stated in 65 C.J.S. Negligence, § 174, p. 851: "Thus, if plaintiff surrendered his better judgment on an assurance of safety or a promise of protection he did not assume the risk unless the danger was so obvious and so extreme that there could be no reasonable reliance on the assurance."

Such comment is approved in Fletcher v. Kemp, supra, loc. cit. 183, where the court said: "In the instant case * * * reasonable minds might differ as to the voluntariness of plaintiff's exposure to risk. * * * Since all reasonable minds would not come to a single conclusion on the voluntary character of plaintiff's exposure, it was a question for the jury and not the court."

So, in the case at bar, plaintiff did not volunteer. Defendant requested him to help, told plaintiff what and how to do the task and reassured plaintiff when questioned as to the danger in so doing. Under these circumstances, the question was for the jury.

In all of the cases cited by defendant in support of his argument that plaintiff was contributorily negligent as a matter of law there was no "request or invitation" by the defendant to do the act nor was there any "reassurance by the defendant."

The courts have repeatedly held that under factual situations, somewhat similar in that the hazard and defect is more or less obvious to the plaintiff, the plaintiff is not contributorily negligent as a matter of law, but that it was a jury question. As said in the case of Hahn v. Flat River Ice & Cold Storage Co., 285 S.W.2d 539 (Mo.Sup.): "Where one relies and acts upon the directions and assurances given him by another as to the proper manner of performing a task or operation, in relation to which the latter owes him some duty as to his safety, it is ordinarily a question for the jury to resolve whether the directions and assurances given were improper, and such as to amount to negligence in the particular circumstances, and also whether the reliance upon the following out of them in the situation involved constituted contributory negligence."

We rule the contention against defendant.

Defendant next contends that the court erred in giving at plaintiff's request Instructions P–2 and P–3. Defendant asserts that neither instruction submits any principle or theory of negligence or hypothesizes any facts which would constitute negligence. Thus the substance of defendant's attack on these instructions is that plaintiff made no submissible case. Defendant refers us to the same authorities cited under his Point I.

Once again, defendant arbitrarily calls plaintiff a volunteer, which he was not under the facts, and even if he were, defendant owed plaintiff a duty because plaintiff (1) had an interest in the work and property and (2) plaintiff was requested and directed by defendant to act. Fletcher v. Kemp, supra.

And again, defendant states that the only way plaintiff can make a case is on "failure to warn". Once again, falling into the error of classifying plaintiff as a volunteer and ignoring the facts that (1) plaintiff was on his own land where he had a right to be, (2) plaintiff was interested in the work and property and (3) defendant requested, directed and told plaintiff what to do and how to do it. Under these facts, plaintiff cannot be a volunteer. But, even if he were, the cases point up the duty owed by defendant to plaintiff and in such cases one finds nothing that states nor intimates that failure to warn is the only ground of negligence and basis of recovery. The contention lacks merit.

Defendant next claims that it was error to refuse his Instruction D–A. He says: "Where plaintiff does not submit any specific negligence, the simple instruction that 'if you find defendant was not guilty of any negligence as submitted in other instructions' is a good instruction." That is true. However, it has no bearing here because plaintiff *did* submit specific negligence.

■ Defendant's fifth point is that the court erred in admitting evidence as to damages by reason of plaintiff's loss of future crops. Plaintiff testified that due to his injuries he was unable to plant approximately twenty-five acres of corn on his own land;

that for fifteen years he had "cropped" the Hall land which joins plaintiff's home place; that he had planned on putting in a crop on forty acres of the Hall place.

In a case involving a farmer, Myers v. Karchmer, 313 S.W.2d 697 (Mo.Sup.), the same contention was made as is made here, i. e., that since plaintiff was a farmer, he was engaged in a business operation and any loss would be a loss of business profits, hence a matter of speculation and conjecture. The court overruled the contention and said, loc. cit. 705, "from the evidence * * * at least a part of plaintiff's income was derived from physical labor, skill and knowledge, without the employment of substantial capital. * * * There was substantial evidence that plaintiff, by reason of [his] injuries, would sustain a loss of future earnings. The amount of such future earnings was for the jury on the evidence presented."

In the instant case, plaintiff, after a proper foundation showing crops planted, yield and similar conditions, introduced evidence as to the loss of crops for one year only, 1961, the year plaintiff was crippled and unable to work. The point lacks merit.

 Defendant's final contention is that the court erred "in failing to discharge the jury after plaintiff's voluntary statement about insurance." Plaintiff was asked by his counsel: "How did you happen to go down there on this day and time? A. I was interested. I just went down there to see how he (defendant) was getting along. Q. Now, if you will just tell the jury what happened." Plaintiff's answer then recited what he was doing, how the accident happened, etc., which occupies twenty-three lines of the transcript, and then plaintiff voluntarily said defendant came to see him in the hospital, and said, "Well, I wouldn't worry about that. He said, 'I've got insurance with the Fidelity Insurance Company.' He told that to me." Thereupon, the court instructed the jury to disregard the last statement of plaintiff and not to consider it as evidence.

In the case of Vesper v. Ashton, 233 Mo. App. 204, 118 S.W.2d 84, plaintiff's counsel asked plaintiff, "Who was the man that came out and wrote this up?" (Referring to statement) Plaintiff replied, "As I understood, he was an insurance man." In an exhaustive opinion this court held:

"There are a number of cases holding that where a question is asked in good faith and the answer, such as the one involved in the case at bar, is voluntary on the part of the witness, there is not error in refusing to discharge the jury because of the mention of the question of insurance by the witness." (Cases cited.) "However, in the last analysis, whether the jury should be discharged, under such circumstances, depends upon whether there was good or bad faith in the injection of the question of insurance. Jablonowski v. Modern Cap Mfg. Co., 312 Mo. 173, 201, 279 S.W. 89; Cazzell v. Schofield, 319 Mo. 1169, 1195, 8 S.W. 2d 580.

"It was admitted at the trial that the statement of the witness about the insurance was purely voluntary and, of course, counsel for plaintiff did not act in bad faith. There is nothing to show that plaintiff, herself, acted in bad faith in the matter and we cannot say that the court erred in refusing to discharge the jury under all of the circumstances."

Likewise, in the instant case, the statement was not responsive to the question asked, but purely voluntary, and there is no showing of bad faith on the part of plaintiff.

In determining whether a mistrial should be granted because of the improper injection of insurance into the case, much must be left to the sound discretion of the trial court, and it is only where a manifest abuse of discretion appears should the appellate court interfere. Gray v. Williams, 289 S.W. 2d 463 (Mo.App.) We find no such abuse of discretion here.

Finding no error prejudicial to defendant, the judgment is affirmed. All concur.