**William COLEMAN, Plaintiff-Respondent,**

v.

**August BUEHNER, Sr., d/b/a Gus Meat Company, Defendant-Appellant.**

No. 33299.

St. Louis Court of Appeals.

Missouri.

July 15, 1969.

Evans & Dixon, Eugene K. Buckley, John P. Fons, St. Louis, for defendant-appellant.

Henderson, Heagney & Snyder, Francis J. Nolan, St. Louis, for plaintiff-respondent.

LYON ANDERSON, Special Commissioner.

This is an action for damages for personal injuries alleged to have been sustained by plaintiff as a result of defendant's negligence. A trial before the court and a jury resulted in a verdict and judgment in favor of plaintiff in the sum of $10,000. Defendant has appealed from the judgment.

The case was tried on an amended petition which was in two counts. At the close of all the evidence plaintiff dismissed Count II and submitted the case on the issues raised in Count I, and defendant's answer thereto.

Count I alleged that defendant was engaged in the sale of meat; that on June 5, 1963, plaintiff was lawfully on defendant's premises at the invitation of defendant's agent and servant; that defendant maintained on said premises an electrically powered meat grinding machine, the feeder hole of which was unguarded and which was not reasonably safe for use by business invitees; that due to the negligence of defendant, plaintiff's hand was caused to come in contact with the blades, knives and worm of said machine, whereby plaintiff's hand and all parts thereof were lacerated, torn, emasculated and severed from his left arm. The negligence alleged was in the maintenance of the machine with an unguarded feeder hole, in failing to warn plaintiff of the dangers of the machine, and in locating the machine in a place where it was dangerous to persons rightfully on the premises as was plaintiff at the time he was injured. The petition then set out at great length the injuries sustained and ended with a prayer for damages in the amount of $25,000.

Since Count II was dismissed it will not be necessary to review its allegations. Suffice it to say that Count II was based on the theory that plaintiff was an employee of defendant at the time he was injured. Plaintiff's theory below was and in this court is that he was an invitee on the defendant's premises when he was injured.

Defendant by his answer admitted he operated the meat shop as alleged by plaintiff in his petition but denied each and every other allegation therein contained. As an affirmative defense defendant pled that whatever injuries, if any, plaintiff sustained on the occasion in question were directly caused or contributed to by plaintiff's own negligence.

Among the many points relied on by defendant on this appeal is that the trial court erred in overruling his motion for a directed verdict at the close of the whole case. In support of this contention it is urged that plaintiff failed to make a case for the jury on the issue submitted; and that plaintiff was guilty of contributory negligence as a matter of law. We think these contentions should be sustained. Therefore, it will not be necessary to consider the other points relied on by defendant.

In passing on the issues presented we will consider only facts and circumstances shown by the evidence which are favorable to plaintiff, and give plaintiff the benefit of all reasonable inference which may fairly be drawn therefrom. We will disregard de-

fendant's evidence, unless it aids the plaintiff's case. Thaller v. Skinner & Kennedy Co., Mo., 315 S.W.2d 124; Price v. Nicholson, Mo., 340 S.W.2d 1, 95 A.L.R.2d 599; Johnson v. Missouri-Kansas-Texas Railroad Company, Mo., 334 S.W.2d 41.

In reviewing the contention that plaintiff failed to make a submissible case of negligence we will confine ourselves to the issue submitted by plaintiff's verdict directing instruction. Guthrie v. City of St. Charles, 347 Mo. 1175, 152 S.W.2d 91.

By said instruction the jury was authorized to find for plaintiff if they believed there was an unguarded meat grinder located at a place where it was not reasonably safe, for persons using it, which condition plaintiff did not and, by using ordinary care, could not have known; that defendant knew or by using ordinary care could have known of said condition, and failed to use ordinary care to warn plaintiff of it; and that as a direct result of such failure, plaintiff was injured.

Defendant owned and operated a meat company known as Gus Meat Company located at 8509 Rosemary Avenue in St. Louis County. There he sold dressed meat and meat products to the public on a wholesale and retail basis. There were two parts to this building. In the front was the retail shop and in the rear the food processing department. In the latter there were freezers where meat was stored, and various machines including an electric grinding machine attached to a table located in the northeast corner of the room. The surface of the table was stainless steel. There was a hole or opening in the table five or six inches in diameter, through which meat was fed into the grinder after it had been cut into small pieces by the person operating the grinder. The hole into which the meat was placed was at the corner of the table next to the wall. The grinding mechanism was about a foot below the surface of the table and was located on a stool. On the north wall within easy reach of the operator was a safety device

consisting of two buttons. To turn off the grinding machine the black button is pushed. The other button is red and turns on the machine. There was no guard over the opening in the table through which the pieces of meat were dropped.

Defendant is the sole owner of the business. His two sons, August Buehner (known as Gus, Jr.) and Richard Buehner were the only employees at the meat company. Gus, Sr., also worked there.

On June 5, 1963, plaintiff while working at the table placed his hand through the opening in the table while the grinding machine was in operation, and received serious injury resulting in the loss of several fingers.

Nicholas M. Blassie, Executive Director of Labor Food Council of Greater St. Louis, and former president of the Meat Cutters Union testified he had worked with and was familiar with various types of meat cutting machines; that he had dismantled and reassembled such machines thousands of times; that guards were available for such machines; and that it was the practice of the trade to use them at all times while the machine was being used.

Gus Buehner, Jr., testified that originally there had been a guard on the machine in question, but after the stainless steel table was put in the elevation of the table surface above the grinder was such that it was believed a guard was not required. The worm or grinding device was located in a horizontal position about one foot below the surface of the table. The worm is a spiral device which grinds and pulverizes the meat and pushes it toward the knives and sieve-like plate at the end of the machine.

There was an air conditioner located on the north wall near the ceiling, above and slightly west of the meat grinder. The front was rounded in shape and extended outwardly from the wall about two feet. It was about seven or eight feet from the

floor. The top was against the ceiling. It had a fan that would draw in air and throw it out. It had been repaired by putting motors in it, but the record does not show when that was done. It was in operation on June 5, 1963, when plaintiff was injured. Plaintiff testified that the air conditioner "spit water" when he was working the meat grinder. Plaintiff never complained to any one about this. Gus, Jr., plaintiff's witness, testified that the air conditioner was equiped with a pipe to drain condensation or moisture and carry it into another room and that he had never had any water from the air conditioner hit him while he was working at the table.

Plaintiff, William Coleman, was fifty-six years old at the time of the trial (Jan. 29, 1968). When a child he attended a public school in St. Louis for a short period of time, after which he was sent to a special school for handicapped children because he was not able to speak plainly. Later, on account of truancy, he was sent to the St. Louis Training School on Bellefontaine Road. His sister testified that he could read and write, but could not figure too well.

At the time of his accident, June 1963, plaintiff was regularly employed as a waiter and custodian at a restaurant-tavern known as the Ten Mile House, located at Gravois and Rock Hill Road in St. Louis County. His salary at that time was $25.00 per week and his working hours were from 6:00 A.M. to 10:30 A.M. or noon. He had previously worked at the Post Office as a custodian for seven years.

Plaintiff was acquainted with defendant's son, August C. Buehner, Jr., (referred to as Gus, Jr.). Gus, Jr., worked for defendant as a driver and salesman. Gus, Jr., also owned and operated a barbecue stand on Tesson Ferry Road in St. Louis County. He would work at the barbecue stand in the afternoon when off duty at Gus Meat Company. He would work there until midnight or 12:30 A.M.

Plaintiff testified that he began working for Gus, Jr., at the meat company and at the barbecue stand about two years before he had his accident. He stated he would arrive at the barbecue stand about four o'clock in the afternoon and work there until closing time at midnight. His duties were to barbecue ribs. Plaintiff further testified that he also had, at the request of Gus, Jr., worked at the meat company during this period of time. His duties were to clean the floor, burn the trash and grind hamburger. He stated he did not have regular working hours at the meat company, but would work in the afternoon after he quit work at the Ten Mile House which was around 12 o'clock. He would go to the meat company three or four times a week. He was paid $1.00 per hour by Gus, Jr., who obtained the money from a cash box in the retail portion of the store. Plaintiff gave the following testimony:

"Q. And you were always paid by Gus, Jr.?

"A. That's right.

"Q. And the times Gus, Jr., would go to this cash box and get the money out—Gus, Sr., wasn't around, then, was he?

"A. I wouldn't know. I was in the back room, see.

"Q. You wouldn't be there when he got the money out?

"A. Once in awhile I saw Gus go get the money and he came back and give it to me, but I didn't know who was in front.

"Q. So you don't know whose money it was he gave you—whether it was his, his dad's, or his brother's, or what?

"A. That's right."

Gus, Jr., who was called as a witness for plaintiff testified that plaintiff occasionally helped him at the meat com-

pany; that he would ask plaintiff to empty garbage, burn paper, rake sawdust and grind meat; that plaintiff did not work for the meat company but for him; that plaintiff would work two or three days a week for a "* * * half an hour—maybe forty-five minutes—maybe an hour and a half"; that neither he nor his father paid plaintiff for this work; that if he paid plaintiff anything "* * * it was because of him working at the barbecue stand."

Plaintiff testified that he worked for Gus, Jr., at the meat company, that Gus, Sr., never told him to do anything, and that the only conversation he had with Gus, Sr., was "Just to say hello—that was all." Plaintiff stated he never worked in the retail part of the store. Gus, Jr., always gave him directions and told him what to do. Gus, Jr., taught him how to run the grinding machine.

On June 5, 1963, plaintiff went to defendant's meat company. At that time, Gus, Jr., gave him about one hundred and fifty pounds of meat to grind. Plaintiff was completely familiar with the operating parts of the machine. He testified:

"Q. Had you ever taken the machine apart?

"A. Yes, sir * * * I took the whole thing apart * * * The worm and everything.

"* * * * * *

"Q. And you knew from taking this machine apart that it was this grinding mechanism or worm that actually pulverized or ground up and chopped up the meat, is that right?

"A. Yes, sir.

"Q. And that was the part that was twelve inches below the top surface of the table—right?

"A. Yes, sir.

"Q. Now, on this particular day, did I understand you to say that you

changed some part of the machine to alternate from coarse to medium to fine cutting, is that right?

"A. Yes, sir.

"Q. How did you do that—how?

"A. I had to put a piece of metal in there and turn the wheel to loosen the wheel; then I took the wheel off; then I took a piece of metal out about that big (indicating) and then put another piece of metal in the same size; then put it back together again.

"Q. So actually on this day to some extent you had to take the machine apart a bit in order to replace those cutting devices?

"A. Yes.

"Q. Now, when you did that—you turned the motor off?

"A. Yes.

"Q. Now, the motor was controlled by a switch?

"A. Yes, sir.

"Q. And was that switch on the wall?

"A. Yes, I had to just press a button and it would go on or off.

"Q. And could you reach it with your hand?

"A. Yes, sir."

Plaintiff had used the meat grinder several times a week for about two years before the date of his accident. Gus, Jr., showed plaintiff how to use and dismantle the machine. Plaintiff had, previous to his injury, taken the machine apart at least 25 or 30 times. He knew it was dangerous for his hand to come in contact with the grinding part of the machine. Plaintiff testified that Gus, Jr., did not tell him that the machine was dangerous. He also stated he never saw any warning signs about the machine.

After plaintiff finished grinding the meat, he began to clean off the table by pushing scraps of meat from the table into the meat grinder with a wooden-handled metal scraper. The scraper was about four inches square. The machine was in operation. Plaintiff was aware of this fact. Plaintiff testified that when he was about finished, water from the air conditioner started to "spit the water out, and then I reached up with one of my hands to wipe my glasses off and the scraper fell, * * * I don't know if I got my glasses wiped off or not." Later he testified his glasses were foggy with water. Plaintiff then reached down into the hole in the table to get the scraper and his hand went into the grinder. Plaintiff testified: "I reached down to get the scraper, and I don't know whether I got it or not, but I pulled my hand out and it was all cut * * * And I went out and showed Gus my hand and he wrapped a towel over it, and they called an ambulance and then I went to Alexian Brothers." He stated he did not know if he got his glasses off, or whether he had them on when he reached the hospital. Plaintiff further testified:

"Q. Now, if you remember, Mr. Coleman, when you reached for this scraper, did you reach around in several places, or not?

"A. No, I just reached straight down.

"Q. Do you know if it had fallen in the hole?

"A. I know it fell some place. I heard it fall.

* * * * * *

"Q. But after it fell, did you press the button to turn off the machine?

"A. No.

"Q. I believe you described before what you did was you reached your hand straight down in an effort to get the scraper?

"A. Yes, sir.

"Q. And you had to reach your hand down about a foot before it reached the point where it was cut off?

"A. Yes, sir.

"Q. You say about a foot below the surface of the table in that hole?

"A. Yes, sir.

* * * * * *

"Q. Now, therefore, when you put your hand down into that hole at the time you got hurt, it was necessary, actually, for you to more or less stoop over a little bit—you had to kind of lean over with your shoulder, isn't that right?

"A. Yes, sir.

"Q. You had to bend over a little bit in order to get your hand down into the hole, isn't that right?

"A. Yes, sir.

* * * * * *

"Q. In other words, your hand was on the top of the surface and then your hand went down into the hole?

"A. Yes.

"Q. And you knew it was going into the hole, didn't you?

"A. Yes sir.

* * * * * *

"Q. Did you know where the scraper was?

"A. I didn't know where it was at.

"Q. You were just reaching for the scraper?

"A. Yes."

A detailed statement of the facts with reference to the injury will not be made because it is not material to a determination of the issues presented on this appeal.

Defendant contends that the court erred in failing and refusing to sustain his

motion for a directed verdict for the reason that plaintiff failed to prove a submissible case of the alleged negligence submitted by plaintiff's verdict directing instruction. As stated the case was submitted on defendant's alleged negligent failure to warn plaintiff an invitee, of a dangerous condition of which plaintiff did not, and by using ordinary care, could not have known.

In support of the above mentioned assignment of error it is urged that plaintiff was a volunteer to whom the only duty owed was not to injure him through wilful and wanton negligence; that such negligence was not shown. It is further urged that since plaintiff had full knowledge of the danger of placing his hand into the opening of the table which led to the grinding device, there was no duty to warn plaintiff of such danger. It is then urged that plaintiff was guilty of contributory negligence as a matter of law.

We deem it unnecessary to determine whether plaintiff was a volunteer or an invitee on defendant's premises at the time he was injured. This for the reason that regardless of his status there was no actionable negligence shown. Plaintiff was fully aware of the danger involved. He had worked at the machine for at least two years. He had taken it apart 25 or 30 times. He knew where the grinding mechanism was located, 12 inches below the surface of the table. He knew that it would grind and chop up meat, and that it was dangerous for a person's hand to come in contact with the grinding part of the machine. When he reached for the scraper he knew he was reaching into the hole through which meat was dropped to be cut up and ground.

■ Defendant could not be found negligent in failing to warn plaintiff of facts of which he had full knowledge. There is no duty to warn a person on the premises of dangers which are known, or are as well known to such person as to the owner or occupant, or which are obvious, or should have been observed by such person in the exercise of ordinary care. 65 C.J.S. Negligence § 63 (53), p. 768; Smith v. Forrester-Nace Box Co., 193 Mo. 715, 92 S.W. 394.

■ Plaintiff was also guilty of contributory negligence as a matter of law for the reason that he intentionally exposed himself to a known and appreciated danger. He had not only operated the machine several times a week for two years, but had previously dismantled it at least 25 or 30 times. He, therefore, knew the location of the worm or grinding device. He also knew its purpose. He also knew it was dangerous to permit one's hand to come in contact with the moving parts, and he possessed that knowledge when he reached into the opening in the table in the manner described in his testimony. He testified: "Q. And you did know it was dangerous to get your hand down into the grinding part of the machine? A. At that time, yes."

Plaintiff contends that the issue of contributory negligence was for the jury. In support of this contention it is urged that plaintiff was not aware of the danger at the time in question for the reason that he was momentarily distracted by the water which was sprayed on his glasses by the air conditioner. He cites in support cases where a pedestrian has his attention diverted by the act of another, and thereafter steps into a crack of which he had previous knowledge. Also cases where a person whose attention has been diverted walks into some object of which he had prior knowledge. These authorities lend no support to plaintiff's theory. Plaintiff testified that at the time of the occurrence he knew his hand was going into the hole, and knew it was dangerous for his hand to come in contact with the grinding part of the machine. There was no evidence to support the theory of momentary dis-

traction which caused him to become unaware of the danger.

It is also contended that although plaintiff knew it was dangerous for him to put his hand into the grinding machine, his mentality was such that he did not appreciate the danger at the time. In support of this contention plaintiff has cited a number of cases where minors were injured while operating complicated machines. In each case cited there was evidence from which a jury could reasonably find that the injured party, on account of his youth and lack of experience or proper instruction, did not fully appreciate the danger involved. In the case at bar there was no such showing. While plaintiff was not very learned, he was not a youth, nor was he inexperienced in operating the machine. He knew how the machine operated and, according to his own testimony, fully appreciated the danger involved at the time he was injured.

There was no justifiable reason for plaintiff to reach so far through the opening in the table to recover the scraper without turning off the machine. The turn off button was within easy reach. He knew the machine was in operation and that what he did was dangerous. In our judgment the evidence is such that all reasonable men would conclude that plaintiff was guilty of contributory negligence as a matter of law. In such a case no recovery can be had. Jacobson v. Vestal, Mo., 361 S.W.2d 677; Hahn v. Flat River Ice & Cold Storage Co., Mo., 285 S.W.2d 539; Chisenall v. Thompson, 363 Mo. 538, 252 S.W.2d 335; Crandall v. McGilvray, Mo., 270 S.W.2d 793; Doerr v. St. Louis Brewing Ass'n, 176 Mo. 547, 75 S.W. 600; Smith v. Forrester-Nace Box Co., 193 Mo. 715, 92 S.W. 394; Stegmann v. Gerber, 146 Mo.App. 104, 123 S.W. 1041.

For the reasons heretofore stated the judgment of the trial court should be reversed. It is so ordered.

PER CURIAM:

The foregoing opinion by LYON ANDERSON, Special Commissioner, is adopted as the opinion of this court. The judgment is reversed.

BRADY, Acting P. J. and JAMES KEET, Jr., Special Judge, concur.