Floyd E. MARSHALL, Plaintiff-Appellant,

v.

OZARK GAS AND APPLIANCE COMPANY, INC., a corporation, and Skelly Oil Company, a corporation, Defendants-Respondents.

No. 9358.

Missouri Court of Appeals, Springfield District.

Feb. 21, 1974.

E. Mitchell Hough, David W. Bernhardt,
Arthur E. Curtis, Bussell, Hough, Greene

& Bernhardt, Springfield, for plaintiff-appellant.

Russell G. Clark, James H. Wesley, II, Woolsey, Fisher, Clark & Whiteaker, Springfield, for defendant-respondent Ozark Gas & Appliance Co., Inc.

C. Wallace Walter, Kenneth T. Walter, Mann, Walter, Burkart & Weathers, Springfield, Sam C. Oliver, Tulsa, Okl., for defendant-respondent Skelly Oil Co.

TITUS, Judge.

An October 2, 1970, propane gas explosion caused injuries to plaintiff, then a 52-year-old auctioneer, and damage to his mobile home, personal possessions and automobile. Twenty days later on October 22, 1970, plaintiff instituted this action which ultimately went to trial commencing May 15, 1972, on plaintiff's third amended petition. Counts I and II, respectively, alleged damages against defendants Ozark Gas and Appliance Company and Skelly Oil Company in the sum of $500,000 for personal injuries and $19,000 for property damage; Count III claimed $1,182,564 exemplary damages against Skelly alone. At the close of plaintiff's evidence, the trial court sustained Skelly's motion for a directed verdict on Count III. The jury returned to the Circuit Court of Greene County its verdict awarding plaintiff $300,000 for personal injuries and $14,000 for property damages against both defendants. Plaintiff has appealed from the order of the circuit court granting defendants a new trial "on all issues." § 512.020 RSMo 1969, V.A.M.S. Two grounds were recorded for the trial court's order (Rule 78.01, V.A.M.R.), but it is necessary that we consider only its finding "that the verdict in this cause is so grossly excessive as to indicate bias and prejudice on the part of the jury."

A distinction exists between verdicts a trial court considers to be simply excessive and those it conceives to be so excessive as to indicate bias and prejudice. The first results from the jury's honest error in judging of the nature and extent of plaintiff's injuries by awarding damages disproportionately to sums usually allowed for comparable injuries under the rule of uniformity; this type of jury mistake is correctible without a new trial by requiring a remittitur. On the other hand, a verdict that is so grossly excessive as to demonstrate bias and prejudice, is one deemed to have resulted from jury misconduct via fixing an excessive figure as the result of bias and prejudice engendered during the course of the trial. Such misbehavior vitiates the entire verdict, both as to the amount of the award and the determination of liability and cannot be corrected properly through remittitur but only by a new trial on all issues. Deaner v. Bi-State Development Agency, 484 S.W.2d 232, 233[2] (Mo.1972); Stubbs v. Kansas City Terminal Railway Company, 427 S.W.2d 257, 260[1–3] (Mo. App.1968). Unlike an appellate court, a trial court may find bias and prejudice from the size of the verdict alone. Johnson v. Allen, 448 S.W.2d 265, 270[6] (Mo. App.1969). When a new trial is granted for that reason, this constitutes a discretionary ground for granting a new trial [Killian v. Wheeloc Engineering Company, 350 S.W.2d 759, 762–763[5] (Mo.1961)], and that order must be sustained on appeal unless all the evidence as to plaintiff's injuries and damages, viewed in the light most favorable to sustention of the trial court's ruling, shows that there was no substantial basis for the order. Day v. Union Pacific Railroad Company, 276 S.W.2d 212, 217[5] (Mo.1955).

Plaintiff was hospitalized from the day of the explosion (October 2, 1970) until November 3, 1970, and incurred hospital charges of $1,663.40. His treating physician, whose total bill was $175, testified plaintiff had sustained "second degree burns of his face, hands, left shoulder, left thigh, both legs and feet." All burns, except those to the hands, were treated "by

open treatment;" the "hands were dressed for about three days, and then the open treatment was continued on that." The doctor said "[s]econd degree burns simply means blistered," although they are "the most painful type." No infection, limitation of motion or scarring resulted from the burns. The physician last saw plaintiff professionally on December 21, 1970. As summarized in plaintiff's brief: "Fortunately [plaintiff] physically recovered from the burns except for some pigmentation and discoloration of the skin."

On December 30, 1970, or 9 days after being discharged by his treating physician, plaintiff went to a psychiatrist "as a self-referral," i. e., "He referred himself. He was not referred by any other physician." According to the psychiatrist, plaintiff complained that since being discharged from the hospital on November 3, 1970, he had experienced "a cloudy memory, [had] lost confidence in himself . . . his sleep . . . was fitful. He was tired in the morning, had nightmares, was hearing voices." The psychiatrist noted that while plaintiff "related his history, events, rather coherently . . . he was tearful . . . and showed signs of psychomotor retardation, which is a slowing down of all processes, walk, speech, et cetera. He was somewhat hard of hearing and his voice was low pitched." Plaintiff was hospitalized by the psychiatrist from December 30, 1970, to January 12, 1971, for testing and "further evaluation." The hospital bill was $591.05 and that of the psychiatrist was $186. The testing showed plaintiff had an I.Q. (intelligence quotient) of 74, "which is in the retarded range;" the psychiatrist made "a diagnosis of involution melancholia or involutional depressive reaction," and described this as "a depressive reaction which occurs during the change of life." Shock treatment was recommended but refused by plaintiff. Following January 12, 1971, plaintiff did not again seek the services of any physician until approximately a week before trial or on May 8, 1972, when he again saw the psychiatrist. Observations of the psychiatrist at that time were similar to those he had made previously and that plaintiff "looked like an old man before his time." The psychiatrist opined at trial that plaintiff's condition "was triggered by the explosion" and if it went untreated "will continue in the future." The psychiatrist felt plaintiff could not function as an auctioneer "in a business-like manner." Under cross-examination the psychiatrist acknowledged that "numerous items . . . can bring on" involuntional depression, among them being marital problems, and that, "[t]o a certain extent," this depression "happens to every male" during the change of life. When prompted to do so, the psychiatrist recalled plaintiff telling him he had gone through three marriages and that plaintiff's latest marital difficulty was experienced "five or six months prior to my examination," but that plaintiff "didn't show any emotion when he was talking about it." Upon being informed that in the year 1968 plaintiff had filed an application for bankruptcy and for the first nine months of 1970 (before the explosion on October 2, 1970) plaintiff had a gross income of only four hundred dollars, the psychiatrist agreed "[f]inancial difficulties can cause depression." Regarding prior references to plaintiff being "hard of hearing," the psychiatrist testified he did not know if it was produced by the involutional depression and had no opinion if it was attributable to the explosion. There was no evidence relating plaintiff's low I.Q. to the casualty in question; neither was there a showing the explosion diminished his normal intelligence quotient.

Fellow auctioneers and plaintiff's brother-in-law, in effect, testified that before the explosion plaintiff was an ambitious auctioneer, a "top man," and a "go-getter," but that after the accident plaintiff appeared to have lost his ambition and could not adequately handle the simplest tasks connected with an auction sale. However, and undoubtedly as an unwelcomed surprise to plaintiff who called him, one erst-

while associate of plaintiff when asked concerning his observations of plaintiff's intelligence, attitudes and conduct following the explosion in comparison to those traits before the casualty, answered: " . . . I can't say that I noticed any difference in him . . . he seems like the same fellow I've always known."

It is of interest to note that in the some 65 transcript pages of plaintiff's testimony, he was not asked nor did he once allude to any physical or mental pain, suffering or disability he may have experienced as a result of the explosion, albeit on cross-examination he agreed to the hereinafter mentioned evidence of his income history and acknowledged he had not "sought the professional assistance of any doctor since the fire on account of [his] hearing." Plaintiff confirmed the psychiatrist's observation that plaintiff had not taken "any medicine of any kind" for "several months" before trial; he also admitted that he previously had "been discouraged in life several times" and one prior time to such an extent he "didn't do nothing for—to speak of for a year or so."

Four U.S. Individual Income Tax Returns filed by plaintiff were received as defendants' exhibits. They disclose the following:

| Year | Gross Income | Net Income |
|------|------|------|
| 1965 | $12,238.61 | $7,536.61 |
| 1968 | 20,440.40 | 520.96 |
| 1969 | 17,530.00 | 2,157.00 |
| 1970 | 400.00 | 347.00 |

The 1968 return includes this statement by plaintiff: "I was engaged in the auctioneering business from January 1, to June 26, 1968. . . . On June 26, 1968 my son took over this business due to my ill health and business conditions. In September 1968, I filed for bankruptcy." Plaintiff and his witnesses testified it was about 1968 that plaintiff had suffered a heart attack causing him to be hospitalized. Nevertheless, as plaintiff's brief recites,

"he had for all practical purposes recovered from that illness."

Plaintiff's answers to written interrogatories showed that from the date of the fire (October 2, 1970) to November 17, 1971, plaintiff had conducted the following sales and had been paid the following commissions therefor:

| Date of Sale | Commission Paid |
|------|------|
| April 26, 1971 | $ 6,250.00 |
| July 19, 1971 | 2,655.00 |
| July 21, 1971 | 3,500.00 |
| August 2, 1971 | 1,200.00 |
| August 3, 1971 | 1,234.00 |
| August 4, 1971 | 824.00 |
| August 10, 1971 | 1,650.00 |
| October 6, 1971 | 1,024.00 |
| Unknown | 6,500.00 |
| Total | $24,837.00 |
| Less Expenses | 18,424.85 |
| Net Income | $ 6,412.15 |

Recognizing that the trial court had the power to weigh the foregoing evidence (as well as all the other) in considering defendants' motions for new trial, which authority we do not possess [Markman v. Bi-State Transit System, 457 S.W. 2d 769, 771 (Mo.1970)]; ignoring, as plaintiff suggests, there was evidence to support the award [Clark v. Quality Dairy Company, 400 S.W.2d 78, 79–83 (Mo.1966)], and accepting all the evidence in the light most favorable to sustension of the court nisi's order [Goodin v. May, 474 S.W.2d 33, 36 (Mo.App.1971)], we are indubitably drawn to the conclusion that substantial evidentiary support existed for the ruling. As viewed from the trial court's point of view, the evidence herein presents a 52-year-old auctioneer who received painful second degree burns to his body that healed within approximately two months without incident or residual physical disability and resulted in only a cosmetic defect (in the form of "some pigmentation and discoloration of the skin") which was not shown to hinder plaintiff in his social or economic pursuits. The dearth of testimony on the subject,

suggests that plaintiff made no complaints to his treating physician of any supposed psychological consequences of the casualty. Rather the plaintiff, by "self-referral," sought a psychiatrist who, after hospitalization for "further evaluation" diagnosed plaintiff's condition as "a depressive reaction which occurs during the change of life" and which, "[t]o a certain extent . . . happens to every male" during that period. While the psychiatrist opined plaintiff's condition "was triggered by the explosion" and would "continue in the future" if untreated, this opinion was based principally upon subjective symptoms related by plaintiff and assumed that plaintiff in fact had the disabilities complained of and that such conditions did not antedate the explosion. The opinion of the psychiatrist as to the time of the onset of plaintiff's condition was not fully compatible with plaintiff's history of marital and fiscal difficulties which, admittedly, could produce a depressive state, or with plaintiff's admission that before the explosion he had experienced periods of discouragement and one to such an extent that he " 'didn't do nothing for—to speak of for a year or so.' " Also the observations of the psychiatrist and plaintiff's auctioneer friends that plaintiff could not function effectively in the auction business after the accident, are not harmonious with the fact that in the 10 months following the explosion plaintiff's gross and net earnings as an auctioneer exceeded by $6,907 and $3,908.-15, respectively, his gross and net earnings in the 21 months that preceded the casualty. Moreover, there was no evidence the explosion was the causa causans of plaintiff's I.Q. of 74 or his reportedly being "hard of hearing," and the purported extent of plaintiff's psychological or mental disability is not in keeping with his going without medical care for a year and four months before trial and without medication for several months before trial. In fine, we have a plaintiff who had $2,615 in medical expenses within three and a half months following the injury, but none thereafter for more than a year and with no proof that any future medical expenses will be incurred; a plaintiff who sustained no physical disability from his burns three months after the accident; and a plaintiff whose only claimed disability was diagnosed as a depressive reaction predicated primarily upon subjective complaints which appear to be contradicted by his activities and record of earnings following the explosion.

■ The jury having found the issues of liability in favor of the plaintiff was not at liberty to award any amount of damages it pleased; it was duty bound to award damages commensurate with the nature and extent of the injuries suffered, the disabilities experienced and the expenses incurred. Davidson v. Schneider, 349 S.W.2d 908, 913[5] (Mo.1961). In turn, the trial court, upon being confronted with a claim that the verdict was excessive, "was invested with the right and charged with the duty to consider and weigh the evidence and, in so doing, to accord to the testimony of the respective witnesses such weight and value as in [its] opinion should have been given thereto" [Land Clear. for Redev. Auth. v. Joplin Union Depot Co., 429 S.W.2d 806, 812[15] (Mo.App.1968)], to accord due regard to the rule of reasonable uniformity of awards for similar injuries [Turner v. Yellow Cab Company of Springfield, 361 S.W.2d 149, 158 [12] (Mo. App.1962)], and to determine whether the verdict was excessive by considering what sum would fairly and reasonably compensate for the injuries sustained. Hodges v. Johnson, 417 S.W.2d 685, 690[14] (Mo. App. 1967). The posture of this cause as it reaches us, does not require a recasting of the circumstances in the reported opinions on a comparative basis to the facts in this case to decide whether excessiveness reposed in the verdict vel non. It suffices to say such a comparison would vindicate the trial court's conclusion. "[T]he problem here is whether, viewing the record favorably to the [trial] court's views, there is evidentiary support for the ruling" [Killian v. Wheeloc Engineering Company, supra,

350 S.W.2d at 763], and based upon the evidence as recounted above, we cannot say as a matter of law that it does not support the trial court's order.

The judgment is affirmed.

STONE and BILLINGS, JJ., and ROBERT LEE CAMPBELL, Special Judge, concur.

HOGAN, C. J., not sitting.