Robert MEANS, Respondent,

v.

SEARS, ROEBUCK AND COMPANY, a
corporation, Appellant.

No. 59571.

Supreme Court of Missouri,
En Banc.

May 12, 1977.

Joel D. Monson, Anderson, Gilbert, Wolfort, Allen & Bierman, St. Louis, for appellant.

James P. Holloran, Sommers & Holloran, Inc., St. Louis, for respondent.

PER CURIAM:

In an opinion written by Simeone, P. J., the Court of Appeals, St. Louis District, affirmed a judgment for plaintiff and

against defendant in the amount of $40,000 (the jury had returned a verdict for $65,000); but transferred the case to this court pursuant to Mo.Const. art. V, § 10, saying, "We believe, however, that the authority of an appellate court to review the amount of the remittitur, both as to inadequacy or excessiveness when that issue is raised on appeal by the defendant should be reexamined by the Supreme Court. We therefore order this case transferred for that purpose." We decide the case as though here on direct appeal. We affirm.

The opinion by Judge Simeone (without quotation marks), to and including transfer to this court, is as follows:

This is an appeal by the defendant-appellant, Sears, Roebuck and Company, for a judgment entered by the circuit court of the City of St. Louis on March 10, 1975, in the amount of $40,000 in favor of the plaintiff-respondent, Robert John Means, for personal injuries sustained as a result of a fall from a bicycle purchased at the defendant's store. The judgment of March 10, 1975, was reduced from the jury verdict of $65,000 after plaintiff remitted $25,000. Sears raises several issues on this appeal: (1) the propriety of the verdict directing instruction; (2) the injection of insurance; (3) the gross excessiveness of the verdict and (4) the remittitur. For reasons hereinafter stated, we affirm the judgment of the trial court.

It is not necessary to detail each and every fact in this litigation. We shall state only those sufficient and relevant facts necessary to dispose of the points raised by the appellant on this appeal.

On the evening of Wednesday, August 29, 1973, Mr. Means and his wife, Carolee, together with their minor children, went to the defendant's store in Northwest Plaza Shopping Center for the purpose of purchasing a bicycle which was to be used mainly by Mrs. Means. They purchased a man's five-speed, 27-inch bicycle from the salesman in the sporting goods department —Mr. Robert Lesan. The cost of the bicycle was $79.50. They also purchased a "child carrier" to be attached to the rear of

the bicycle for $15.69. Although a floor sample was available, they requested that Sears assemble a bicycle, for which they paid an additional cost of $7.00. This cost of assembling was added to the sales receipt at the time of the purchase.

The following evening, Thursday, Mr. Means and his family returned to the store to "pick up" the purchase. At the time the bicycle was brought to him, Mr. Means noticed that "[t]he rear fender was rubbing against the wheel." He informed a Sears employee (not Mr. Lesan), whereupon the employee "went and got a wrench and loosened [the fender] back from the wheel and tightened it back up." Mr. Means then placed the bicycle in the trunk of his automobile and drove to Mrs. Means' parents' home "to show them, and we were going to ride it that evening." But "[b]efore we could ride it we found the seat was loose. We had to tighten that. It was wobbling back and forth." That evening, both he and Mrs. Means rode the bicycle. They did not "jump any curbs," "hit any large chuckholes" or "have any type of accident." After riding the cycle that evening, it was taken to their home and placed in the garage. The next afternoon, Mrs. Means rode, but Mr. Means did not. On Saturday, Mr. and Mrs. Means and a neighbor, James Keating, rode the cycle. On this occasion, Mr. Means noticed that the "gearshift lever was loose on the stem." This was tightened. On this occasion, none of the riders experienced any difficulty while riding.

The following morning, Sunday, September 2, 1973, Mr. Means took the bicycle and was going "to ride up to the Target Store to a big parking lot and then just ride back." When he was on top of a hill heading down, the "front wheels [sic] started vibrating very rapidly sideways back and forth approximately six inches or so." He tried to stop. But "[s]uddenly the front wheel went to the left a full ninety degrees. At that time the next thing I knew I was skidding along the road on my stomach." All during this time the handlebars were perfectly straight and "didn't vibrate at

all." He stood up, his knee was bleeding, and he flexed his leg. "I could feel something in there, but it still moved. . . ." He walked back to the bicycle and found the front wheel was "somewhat bent." While standing near the bike, a car pulled up with a couple in it. They asked if he were hurt. They asked if they could take Mr. Means to the hospital or to his house. Mr. Means then hid the bicycle in the weeds, and as he walked "I couldn't move my left knee any more and I kind of fell down." The couple was kind enough to take him to the Christian Northwest Hospital, where he was placed under the care of Dr. Charles Powell, an orthopedic surgeon. After an examination which showed a comminuted fracture of the left patella, Mr. Means was taken to surgery and a total patellectomy was performed. Dr. Powell removed all the fragments of the fractured patella and sutured the quadriceps muscle tendon to the patellar ligament. Mr. Means was placed in a cast. The hospital called Mrs. Means, and she and James Keating arrived at the hospital. Mr. Means informed Mr. Keating of the whereabouts of the bicycle, and later Mr. Keating picked it up and placed it in Mr. Means' garage. Mr. Means spent a week in the hospital and two weeks at home recuperating, before returning to work on crutches. Because he was unable to "get around in the field," Mr. Means' supervisor "gave him some office work," during the time he was in the cast. When the cast was taken off about six weeks later, he couldn't move his leg— "[t]he leg muscles were—I don't know what you call it, they were like jelly . . . ."

By January, 1974, Mr. Means could not bend his left knee more than an inch, but did resume his regular duties in February. When Dr. Powell saw him in December, 1973, some four months after the operation, he "showed only about 10 degrees of active knee flexion and at this time it was apparent that the quadriceps tendon was bound down to the underlying femur and was sticking there which prohibited the tendon moving when he attempted to flex the knee, so he had only 10 degrees of active flexion." So another operation was decided upon. This operation pulled the "knee on both sides of the stuck-down tendon and [was to] just free it up from the underlying femur . . . ." This second operation was performed on March 18, 1974 (although Dr. Powell stated he was admitted in February, 1974), for lysis of the quadriceps tendon. He remained in the hospital after this second operation for a period of two weeks or until March 30, 1974. He convalesced for a period of two more weeks.

Following his discharge, Mr. Means participated in a physical therapy program three times a week until about June 1, 1974. As a result of the second operation and the physical therapy, Mr. Means was able to flex his knee approximately 90 degrees, and was able to return to his normal work. Although he is able to flex his knee, there is still 35% to 40% loss of flexion—"approximately 40 percent range of normal motion." This condition is considered by the physician as permanent.

Dr. Powell stated his opinion that "I don't think that he will ever regain any significant improvement in knee flexion." Despite his condition, Mr. Means returned to his regular job activities by the time of trial in January, 1975. But his condition caused him several problems. He can no longer "squat." In his duties he has to "lay down" to get under something and "going up and down steps is quite difficult." He cannot bend his leg as much as he used to, and there has never been a day when he has not had "some difficulty" with his leg. He can no longer take part in "playing softball" or "run like I used to" or "sit in the front seat of the canoe any more . . . ."

Mr. Means was absent from his employment a total of seven weeks and lost approximately $100.00 per month overtime compensation, and because of his morning therapy he missed other work time.

As a result of all this, he incurred medical and hospital expenses of approximately

$2,600.00, and loss of wages and overtime of approximately $2,100.00.[1]

After the unfortunate accident on September 2, 1973, the bicycle was eventually transferred to the custody of Professor Wallace Diboll, Associate Professor of Mechanical Engineering at Washington University,[2] who, at the request of Mr. Means' attorneys, performed several tests. The professor stated that he had testified in court before and that mechanical engineering "basically involves making of energy and the making of things, equipment, machinery. My particular area is the area of machinery, and the study of that, vibrations, stresses, forces involved in machinery." As stated, Professor Diboll examined the bicycle. He found the wheel distorted. He also testified in some detail concerning the assembly of the handlebars and tube of the fork. In order to make the wheel turn with the handlebars so that a person can have control of the wheel through the handlebars, a sliding nut must be turned and "tightened correctly, fully, sufficiently" so that it is one "rigid piece, so that when you turn the handlebar . . . the wheels will also turn . . .." Professor Diboll performed tests on the cycle to determine the rigidity of the connection between the handlebars and the wheel. This was accomplished by putting the bicycle on a table and holding the "wheel tightly and then [loading] it with a known weight." He applied gradually increasing weights until the handlebars turned with respect to the wheel. Six pounds of weight turned the bars, equivalent to "seventy-eight inch pound of torque." The tests were to determine "how rigid the connection was between the wheel and the handlebar." A similar test was performed on Professor Diboll's own bicycle, which "took" 588 inch pound of torque. In his opinion, "a handlebar, gooseneck, fork connection should withstand at least a thousand inch pound [of torque] if properly assembled." In answer to a hypothetical question, it was the professor's opinion that there was a "defective connection or assembly between the gooseneck and the fork," and that "during the assembly, the nut which goes up into the gooseneck, had not been sufficiently tightened."

During the direct examination of Professor Diboll, plaintiff's trial counsel inquired whether the bicycle at some point left his possession. The professor answered, "Yes," after he had run "all the studies." The following then occurred:

"Q [by plaintiff's counsel] What did you do with the bike?

A I took the bike to St. Louis Test— St. Louis Testing Laboratory.

---

1. Special damages:

MEDICAL

| Emergency Admission and First Operation | $ 400.00 |
|---|---|
| Hospital Bill (Sept., 1973) | 796.70 |
| Hospital Bill (March, 1974) | 1,046.75 |
| Treatment Following Operations | 40.00 |
| Therapy | 327.00 |
| | $2,610.45 |

| Dr. Powell's Testimony as to Bills: | |
|---|---|
| 1st operation | $ 300.00 |
| 2nd operation | 150.00 |
| | $ 450.00 |

SALARY
$925 per month salary
$100 per month overtime

| 7 weeks off work | 1,618.00 |
|---|---|
| 4 or 5 months lost overtime | 500.00 |
| | $2,118.00 |

2. At the trial much was made of the chain of custody of the bicycle. In the interim between the time James Keating picked up the bicycle in the weeds and placed it in the Means' garage and the time of trial, a number of individuals handled the bicycle. First, a law student (Mr. Borgmann) working for Mr. Means' family attorney (Mr. Spilker) picked up the bicycle from the garage and delivered it to the home of the family attorney—Mr. Spilker. Then the case was referred to Mr. Means' trial attorneys, and the partner of trial counsel (Mr. Sommers) picked up the bicycle, and the "child carrier" was removed. The referred attorney delivered it to the home of Professor Diboll. At trial, each of these individuals was called as a witness, and each witness testified that the bicycle introduced in evidence was the same one they handled. In addition, each witness testified that no adjustments had been made while it was in their respective controls.

Q  Why did you do that?

A  It was at a request of one member of your office who said that the defense wanted the bike examined.

[Defense counsel]: I would object to hearsay.

THE COURT: Objection sustained.

Q  (By [plaintiff's counsel])  Where did you take it?

A  I took it to St. Louis—let me check to make sure. I have a receipt for it. St. Louis Testing Laboratories, Incorporated.

Q  You gave it to them and they gave you a receipt for it?

A  That is right.

Q  Have you seen the bike again until you saw it yesterday here in court?

A  I have not. I might add that on the receipt there is an account Aetna Casualty and Surety—

[Defense counsel]: I object to that. I move the Court—

THE COURT: Objection sustained. Don't volunteer anything until you are examined. I will sustain the objection and order it stricken from the record.

\* \* \*"

The attorneys then approached the bench, and defense counsel asked for a mistrial, "because of the volunteered statement, that being Aetna Casualty Surety, given by the witness for the plaintiff . . .." It is unclear from the record just what Aetna Casualty had to do with the cause—no voir dire question was asked, but in any event the trial court overruled the motion.

During the trial, Dr. Powell's video-tape deposition was shown in which the doctor testified as to the injuries, the length of time in a cast, the permanency of the injury, the degree of flexion, and the surgical fees.

At the close of the plaintiff's case, counsel for defendant moved to amend its answer by interlineation to allow the affirmative defenses of contributory negligence and contributory fault. This was granted.

The court instructed the jury and gave, among other instructions, Instruction No. 2, the plaintiff's verdict director.[3] After arguments, the jury returned its verdict in favor of the plaintiff-Mr. Means, in the amount of $65,000, and judgment was entered accordingly.

On February 27, 1975, the trial court ordered that "[i]f plaintiff will, within 10 days, remit the sum of $25,000 from verdict . . . defendant's motion for new trial will be overruled . . .."

The plaintiff did voluntarily remit that amount, and the court entered a judgment from which this appeal is taken.

Sears raises four points on this appeal. It contends that the trial court erred (1) in giving Instruction No. 2, (2) in failing to sustain the motion for mistrial because of Professor Diboll's injection of insurance during his direct examination, because of the "highly prejudicial effect" on the jury which returned a "grossly excessive" verdict; (3) in receiving the verdict because the verdict was "grossly excessive" in that the plaintiff had sustained expenses in the amount of $2,610.45 and is presently employed by the same employer in the same capacity and (4) in overruling the motion for new trial because the verdict was exces-

---

3.  INSTRUCTION NO. 2:

"Your verdict must be for plaintiff if you believe:

First, defendant sold the bicycle, and

Second, the bicycle, as sold, was defective and therefore dangerous when put to a use reasonably anticipated, and

Third, when plaintiff used the bicycle it was in substantially the same condition as when sold by the defendant, and

Fourth, plaintiff used the bicycle in a manner reasonably anticipated and was damaged as a direct result of the bicycle being defective. MAI 25.04 Modified, Offered by Plaintiff."

sive and was not cured by the remittitur of $25,000.

The plaintiff-respondent, of course, counters each of the contentions and insists that the original verdict should be reinstated and that we should award an "additional sum" as damages because the appeal is frivolous.

The appellant's attack on Instruction No. 2 is a broad one. It contends that the court erred in giving MAI 25.04 modified because it is not an accurate statement of the law, is not supported by credible evidence, fails to hypothesize sufficient evidentiary facts, is broader than the pleadings and evidence, is too general, and is misleading and confusing. This broadside attack on the instruction is not warranted.

The instruction is based on MAI 25.04,[4] the verdict director in a products liability case against the manufacturer. MAI 25.04 was modified only insofar as was necessary to accommodate the theory of this case—a products liability case against the retailer. MAI does not contain a similar instruction against a retailer. Specifically, MAI 25.04 was modified to substitute the word "sold" for the word "manufactured," and the word "used" in paragraph third instead of the word "bought."

It is true of course that a deviation from MAI is not only error, it is presump-

tively prejudicial error. *Murphy v. Land,* 420 S.W.2d 505, 507 (Mo. 1967); *Brown v. St. Louis Public Service Company,* 421 S.W.2d 255, 259 (Mo.banc 1967); *State ex rel. State Highway Commission v. Beaty,* 505 S.W.2d 147, 154 (Mo.App. 1974). In *Brown v. St. Louis Public Service Company, supra,* 421 S.W.2d at 259, it is said:

". . . where there is deviation from an applicable MAI instruction *which does not need modification under the facts in the particular case,* prejudicial error will be presumed unless it is made perfectly clear by the proponent of the instruction that no prejudice could have resulted from such deviation." (Emphasis added.)

Yet, where no approved instruction is applicable so that modification of the approved instruction is required, there is no error. *Reed Schmidt and Assoc. v. Carafiol Furniture Co.,* 469 S.W.2d 876, 879 (Mo.App. 1971).

In *Keener v. Dayton Electric Manufacturing Company,* 445 S.W.2d 362 (Mo. 1969), the Supreme Court adopted the rule of strict liability as stated in 2 Restatement, Law of Torts, Second, § 402A (1965). The cause of action was asserted against the wholesale distributor. In the course of the opinion, the court stated that if the evidence supports it, on re-trial, an instruction in substantially the form used in this case should be used.[5] The instruction here was

---

4. MAI 25.04:
   "Your verdict must be for plaintiff if you believe:
   First, defendant manufactured the (*describe article*), and
   Second, the (*describe article*), as manufactured, was defective and therefore dangerous when put to a use reasonably anticipated, and
   Third, when plaintiff bought the (*describe article*) it was in substantially the same condition as when manufactured, and
   Fourth, plaintiff used the (*describe article*) in a manner reasonably anticipated and was damaged as a direct result of the (*describe article*) being defective."

5. "If the evidence supports it on re-trial, an instruction in substantially the following form should be used:

   Your verdict must be for plaintiff if you believe:
   First, plaintiff was (here insert statutory qualification required to bring wrongful death action), and
   Second, defendant sold the sump pump, and
   Third, the sump pump, as sold by defendant, was defective and therefore dangerous when put to a use reasonably anticipated, and
   Fourth, when Harold Keener used the sump pump it was in substantially the same condition as when sold by defendant, and
   Fifth, Harold Keener used the sump pump in a manner reasonably anticipated and, as a direct result of the sump pump being defective, died.
   [unless you believe plaintiff is not entitled to recover by reason of Instruction No. —— (here insert number of affirmative defense instruc-

similar to the one suggested in the *Keener* case and stated the law.

■ Although not in its point, Sears in its argument portion of the brief argues that the instruction misled the jury because it failed to negate any mishandling of the bicycle by Mr. Means, "his wife, his in-laws, or his neighbor after it left Appellant's control." We glean from this that Sears claims error in the trial court's failure to include a "tail" on the verdict director referring to plaintiff's contributory fault.[6] However, no instruction on any affirmative defense was given or offered. Consequently, the trial court did not err. *Lawley v. Kansas City*, 516 S.W.2d 829, 835 (Mo.App. 1974); *Strickner v. Brown*, 491 S.W.2d 253, 254–255 (Mo. 1973); *Shepard v. Harris*, 329 S.W.2d 1, 7 (Mo.banc 1959).

We rule the first point against appellant.

Next, appellant-Sears contends that the injection of "insurance" during the direct examination of Professor Diboll constituted error and that its motion for mistrial should have been granted. Sears argues that the professor had testified in other cases, his experience was known to plaintiff's trial attorney, that it is "very likely" counsel interviewed the professor prior to trial, and that the injection of insurance—this "pernicious and reprehensible" practice—is worse when in fact no insurance is involved. Sears argues that this injection

". . . erroneously and falsely inflamed the passions of the jurors and created bias and prejudice in their minds . . . causing them to return a grossly excessive verdict . . . ..

The almost universal hatred harbored by the general public for insurance companies, should not be held against Appellant."

■ It has long been the law of this state that the improper injection in a jury tried case that the defendant was covered by liability insurance constitutes error, especially so if thrown in purposefully or in bad faith. *Gray v. Williams*, 289 S.W.2d 463, 467 (Mo.App. 1956).

". . . Suffice it to say that, no matter which party is the offender . . ., the condemned practice of injecting liability insurance coverage into jury trials is just as pernicious and reprehensible today as it was fifty years ago, for, as Mark Twain once said, ' "(w)e are all full of human nature" ' . . . .." *Hildreth v. Key*, 341 S.W.2d 601, 615 (Mo.App. 1960).

But not each and every reference to insurance constitutes reversible error.[7] In *Gray v. Williams*, supra, this court did not interfere with the action of the trial court. A single statement concerning insurance under the circumstances did not justify

---

tion)]. Cf. verdict-directing instructions MAI 20.01 and MAI 25.04, published since the trial of this case." *Keener v. Dayton Electric Manufacturing Company*, supra, 445 S.W.2d at 366.

6. Parenthetically, we note that Sears was granted leave to amend its answer at the close of plaintiff's case to allow for the affirmative defenses of contributory negligence and contributory fault. The accepted rule is that contributory negligence is not a defense in a strict liability case. See *Lindsay v. McDonnell Douglas Aircraft, Corporation*, 460 F.2d 631, 636 (8th Cir. 1972). Rather, in order to relieve the defendant of liability, it must be shown that plaintiff discovered the defect in the product and was aware of the danger, but nevertheless proceeded unreasonably to make use of the product and was injured by it. This is the affirmative defense of contributory fault. *Keener v. Dayton Electric Manufacturing Company*, supra, 445 S.W.2d at 365.

7. *Gray v. Williams*, supra, 289 S.W.2d at 467—plaintiff's counsel in voir dire stated to juror " 'your company is not in this case' "—not reversible error; *Paulsen v. Butcher*, 492 S.W.2d 186 (Mo.App. 1973)—plaintiff in an unresponsive answer stated that defendant stayed at the scene and called his insurance company; *Beckett v. Kiepe*, 369 S.W.2d 258, 263 (Mo.App. 1963)—plaintiff stated that defendant said, " 'Well, I wouldn't worry about that. He said, "I've got insurance with the Fidelity Insurance Company." He told that to me.' "; *Vesper v. Ashton*, 233 Mo.App. 204, 118 S.W.2d 84, 89 (1938); *Bridgeforth v. Proffitt*, 490 S.W.2d 416, 426 (Mo.App. 1973); *Conrad v. Twin Oaks, Inc.*, 344 S.W.2d 286, 288 (Mo.App. 1961); *Barger v. Green*, 255 S.W.2d 127, 129–130 (Mo. App. 1953).

holding that the trial judge should have taken more drastic action.

It is the basic principle that when the trial judge is called upon to rule on the question, much must be left to his sound discretion, and only where there is a manifest abuse should we interfere. The trial court is in the most advantageous position to determine whether the issue injected into the case was done in good or bad faith. The action of the trial court will not be lightly disturbed. Where the answer to a question is voluntary and unresponsive, there is no automatic error in refusing to discharge the jury. *Paulsen v. Butcher*, supra, 492 S.W.2d at 187. Here the trial court sustained the objection, requested the jury to disregard it, admonished the witness and no further reference was made to the issue, the court declining to further instruct the jury to disregard the comment.

This is not a situation where one individual sues another and insurance is injected. While we cannot condone the irrelevant injection of insurance, yet under the circumstances here where the defendant is a large company, we cannot say that the trial court, who was in the most advantageous position to assess the situation, abused its discretion in refusing to declare a mistrial. The statement by Professor Diboll was unresponsive, and in a sense an afterthought to a previous question concerning what he did with the bicycle.

Under all the circumstances, we cannot say that the trial court's refusal to discharge the jury constituted prejudicial error.

Next, appellant contends that the court erred in receiving the jury verdict of $65,000 for the reason that the verdict was grossly excessive and the result of bias and prejudice. If such a contention is found to be meritorious, then the verdict cannot stand in any amount and a new trial is required. *Worley v. Tucker Nevils, Inc.*, 503 S.W.2d 417, 423 (Mo.banc 1973); *Marshall v. Ozark Gas & Appliance Co.*, 506 S.W.2d 474, 476 (Mo.App. 1974). A verdict which is so "grossly excessive" so as to indicate bias and prejudice is one in which the jury was guilty of misconduct by fixing an excessive figure as a result of bias and prejudice engendered during the course of the trial. Such misbehavior vitiates the entire verdict, not only as to the amount of the award, but also as to the determination of liability, and cannot properly be cured by remittitur, but requires that the verdict in its entirety be set aside. *Skadal v. Brown*, 351 S.W.2d 684, 690 (Mo. 1961).

The mere size of the verdict does not in and of itself establish that it was the result of bias or passion and prejudice without showing some other error committed during the trial. *Slater v. Atchison, T. & S. F. Ry.*, 224 Mo.App. 824, 24 S.W.2d 660, 666 (1930); *Skadal v. Brown, supra*, 351 S.W.2d at 690; *Friend v. Gem International, Inc.*, 476 S.W.2d 134, 140 (Mo.App. 1971).

Appellant contends that the injection of the false issue of insurance so biased the minds of the jurors that the verdict was "grossly excessive" and, hence, the verdict must be vitiated in its entirety. But we conclude otherwise. The trial court had the opportunity to observe the effect, if any, of the incident, and took appropriate action. We cannot say that the trial court abused its discretion. Neither can we say that Professor Diboll's singular, unresponsive reference, in the context of the entire case, so "falsely inflamed the passions of the jurors and created bias and prejudice in their minds" to render the verdict which they did. This contention is overruled.

Appellant also contended in the trial court that the verdict is "excessive". The basis of this attack is that " ' * * * the jury made an honest mistake in weighing the evidence as to the nature and extent of the injury and in fixing damage and awarded a sum disproportionate to the amounts usually awarded for comparable injuries under the rule of uniformity. Such a mistake can be cured and corrected without a new trial by requiring a remittitur of a portion of the amount awarded' ". *Worley v. Tucker Nevils, Inc., supra*, 503 S.W.2d at 423, quoting from *Skadal v. Brown, supra*, 351 S.W.2d at 689–690.

The trial court concluded that the verdict was excessive and ordered a new trial on that basis unless plaintiff remitted $25,000, which plaintiff did. On appeal defendant contends that the resulting $40,000 judgment is still excessive and seeks further remittitur.

The court of appeals addressed that request and, after consideration of the nature and extent of the injuries received, expenses incurred, the age of plaintiff, the effect on his earning capacity, the economic scene [8] and the result in other cases, held that further remittitur should not be required. However, the court of appeals declined to consider respondent's contention that the trial court should not have required remittitur and that the jury verdict of $65,000 should be ordered reinstated. That action was based on the conclusion that under decisions of this court, including *Webb v. Rench*, 476 S.W.2d 570 (Mo. 1972) and *Carver v. Missouri-Kansas-Texas R.R.*, 362 Mo. 897, 245 S.W.2d 96 (1952), a plaintiff who consents to a remittitur may not question the validity of the court's order after accepting it.

■ As suggested by the court of appeals in certifying this case to us, we have reviewed the question of whether, after remittitur in the trial court, the appellate court should have the right to review the amount of such remittitur as to excessiveness as well as inadequacy when that issue is raised on appeal by appellant by requesting further remittitur. We have concluded that the rule in *Webb* and *Carver* should be modified to permit such review. Fairness so demands. The trial court has ordered a remittitur as a condition for not granting a new trial. Plaintiff has acceded to that directive and made the remittitur. In so doing, plaintiff may reasonably assume that by such action the controversy as to the alleged excessiveness of the verdict has been resolved. When that does not occur

and defendant keeps that issue alive by seeking further remittitur on appeal, the whole issue of what remittitur, if any, is required should be open for consideration by the appellate court. That would permit the appellate court to approve the remittitur ordered by the trial court or order further remittitur or direct that part or all of the remittitur directed by the trial court be restored.

■ Accordingly, we have reviewed the issue of whether the jury verdict was "excessive" on the foregoing basis. We conclude, as did the court of appeals, that further remittitur is not required. We also conclude and hold that the trial court did not err in ordering a remittitur of $25,000 as a condition to not granting a new trial.

Finally, plaintiff requests this court to award additional damages, pursuant to Rule 84.19 [9] on the grounds that this appeal by Sears is "frivolous and pursued by appellant for the sole purpose of delaying the payment of the judgment".

■ A "frivolous appeal" is one which presents no justiciable question and is so readily recognizable as devoid of merit on the face of the record that there is little prospect for success. *State ex rel. State Highway Commission v. Sheets*, 483 S.W.2d 783, 785 (Mo.App. 1972). While we have found no error in the trial court's action or judgment, we do not believe that the appeal was devoid of merit on the face of the record or that there was any bad faith or lack of sincerity which prompted Sears to bring this appeal. See *McMillin v. Sears, Roebuck & Co.*, 523 S.W.2d 111, 113 (Mo. App. 1975); *Lafayette Fed. Sav. & L. Ass'n of Gr. St. Louis v. Koontz*, 516 S.W.2d 502, 505 (Mo.App. 1974). The remedy provided in Rule 84.19 is both drastic and unusual and should accordingly be reserved for those rare and unusual situations where its application is warranted. Suffice it to say,

8. In recent years the extreme growth of inflation in this country has caused the courts of this state to approve larger verdicts than in the past and have seldom had to resort to the use of remittiturs. *Worley v. Tucker Nevils, Inc.*, *supra*, 503 S.W.2d at 423–424.

9. Rule 84.19: "If an appellate court shall determine that an appeal is frivolous it may award damages to the respondent as the court shall deem just and proper."

this is not such a situation. We thus deny plaintiff's request for additional damages based on the alleged frivolous nature of this appeal.

Judgment affirmed.

MORGAN, BARDGETT, HENLEY and DONNELLY, JJ., concur.

FINCH, J., concurs in separate concurring opinion filed.

SEILER, C. J., concurs in result in separate opinion filed.

RENDLEN, J., not participating because not a member of the court when cause submitted.

FINCH, Judge, concurring.

I concur in the principal opinion. I file this separate opinion only because Chief Justice Seiler has filed a separate opinion in which he advocates complete abolition of the *Carver* rule, thereby permitting a plaintiff, after entry of a remittitur, to seek to have the verdict reinstated if defendant appeals, even if defendant has not sought additional remittitur on appeal. That question need not be reached in this case because defendant sought additional remittitur on appeal. However, since the chief justice has set forth the argument for completely abolishing the rule in some later case, I have concluded that, in order to give the whole story, I should set forth reasons why that should not be done.

The opinion of the chief justice is premised on the theory that if a plaintiff enters a remittitur and defendant then appeals, it is unfair if plaintiff is not permitted to seek to take back the remittitur in the appellate court even if the amount of the judgment is not made an issue by the appealing defendant. This is so, he argues, because defendant makes the remittitur on the basis of an expectation that defendant will not appeal but instead will pay the judgment promptly.

In my view, the foregoing premise is not sound. Plaintiff may have a *hope* that defendant will pay the judgment rather than appeal but there is no reasonable basis

for him to rely on an *expectation* that defendant will not appeal. When a defendant files a motion for new trial, asserting that the verdict is excessive and that for other reasons there should be a new trial or an outright reversal, he is not saying expressly or by implication that if the trial court finds the verdict to be excessive and orders a new trial for that reason unless a remittitur is entered, he will forego all other grounds for outright reversal or a new trial nor is there anything in the action of the trial court which says or implies that defendant is expected to forego an appeal and pay the judgment if the remittitur is made.

The remittitur practice never was intended to serve as a complete answer to all objections raised by a defendant in a motion for new trial after plaintiff has obtained a verdict. It was intended to address only the assertion that the verdict is excessive. The trial court's order says only that if plaintiff makes the remittitur the defendant's motion for new trial will be overruled but if not made, the court will grant a new trial on the basis that the verdict was excessive.

When a trial court conditions its action on a motion for new trial on whether plaintiff remits some portion of the amount fixed in the jury's verdict, the plaintiff has three options. First, he may decline to make the remittitur and, after a new trial is ordered, simply proceed to retry his case. Secondly, he can decline to make the remittitur and, after the trial court orders a new trial on the basis that the verdict is excessive, he may appeal and test that order. That was the course followed by plaintiff in *Deaner v. Bi-State Development Agency*, 484 S.W.2d 232 (Mo. 1972). Plaintiff's third alternative is to make the remittitur and thereby get the trial court to overrule defendant's motion for new trial. If the latter course is followed, plaintiff secures a denial of a new trial on the basis of excessiveness and eliminates any question as to the amount of his recovery unless defendant on appeal seeks additional remittitur. He does not eliminate other grounds for relief raised by defendant.

Defendant, after verdict in favor of plaintiff, has a statutory right of appeal if not granted a new trial or an outright reversal by the trial court. If, for example, defendant claims that he is entitled to an outright reversal because plaintiff failed to make a submissible case, or claims that an erroneous instruction dictates a new trial, those objections are not answered by a reduction in the amount of the verdict by remittitur. Defendant is entitled to have those questions reviewed on appeal. If, on that appeal, defendant raises no further question as to the amount of the judgment, he should not be penalized for taking an appeal by having the appellate court say: Because you appealed, we will let plaintiff (a non-appealing party) attempt to take back the remittitur and inject into the appeal the issue as to the amount of the recovery, even though such an issue is not raised by the only appealing party. To do this is unfair to defendant. It swings the pendulum too far. It raises a question of whether such a practice might deprive defendant of equal protection of the law. It most certainly is unusual and extraordinary to penalize an appellant by saying to him that if you appeal, we will permit the respondent to inject into the appeal an issue not raised by appellant and will permit the non-appealing respondent to obtain affirmative relief on the issue so injected.

In supporting his thesis that the present rule is wholly unfair, even if defendant seeks no further remittitur on appeal, the chief justice quotes from the opinion of then Chief Judge Smith in *Best v. Fred Weber Construction Co.*, 525 S.W.2d 102, 108–109 (Mo.App. 1975). However, Judge Smith said more than the sentence quoted. Having observed that defendant appealed after the remittitur, raising as its dominant point that the judgment continued to be excessive, he said this:

" * * * In short, defendant has the benefit of the remittitur, an opportunity to reduce the judgment even more, delay in payment of the judgment, and no risks or adverse consequences from taking an appeal. Plaintiffs, on the other hand, have gained little or nothing from accepting the remittitur, which acceptance may well have been based upon a desire to receive the judgment expeditiously.

"I entertain serious doubt that the remittitur entered by the trial court was warranted, at least in part and possibly in toto. If we are going to continue to permit appellate courts to entertain requests for additional remittitur then we should place the gamble for such appeals equally on the parties. *Where a defendant has sought and received a remittitur from the trial court, which has been accepted by the plaintiff, such acceptance should not preclude an appellate court from examining the propriety of the remittitur where the defendant thereafter appeals. When the defendant elects to place before this court the amount of the damages by asking for additional remittitur, we should not be limited to deciding whether the action of the trial court was inadequate but should decide also whether it was excessive. * * * *"* (Emphasis supplied.)

The unfairness spoken of by Judge Smith was in those cases wherein defendant seeks additional remittitur in the appellate court. This is apparent by the language italicized.

For the reasons indicated, I do not favor overruling completely the rule of the *Carver* and *Webb* cases. Doing so in the case now before us, where defendant seeks additional remittitur, thereby injecting an issue as to the amount of recovery into the appeal, can be justified. It would not be justified, and would be very unfair to defendant, to abolish the rule completely so as to permit plaintiff to raise the issue and obtain affirmative appellate relief on an issue not raised in that appeal by defendant appellant.

SEILER, Chief Justice, concurring in result.

I agree that the $40,000 judgment should be affirmed. But, respectfully submitted, instead of limiting the modification of the rule in *Webb v. Rench*, 476 S.W.2d 570 (Mo. 1972) and *Carver v. Missouri-Kansas-Texas R.R.*, 362 Mo. 897, 245 S.W.2d 96 (1952) to

the situation where the defendant, after obtaining a remittitur in the trial court, seeks further remittitur on appeal, I would do away with the rule altogether and permit the plaintiff to seek to have the jury verdict reinstated whenever defendant appeals, regardless of whether defendant seeks further remittitur on appeal. Otherwise defendant can take his appeal, secure in the knowledge that so long as he seeks no further remittitur on appeal, he can fare no worse than to have to pay the judgment as reduced by the remittitur in the trial court. This is not fair, because as well expressed in *Plesko v. City of Milwaukee*, 19 Wis.2d 210, 120 N.W.2d 130, 135 (1963):
" . . . The objective underlying [the practice of remittitur in lieu of having a new trial] is to avoid the delay and expense of an appeal or a new trial. In most situations, it is likely that the party will accept judgment for such reduced damages rather than undergo the expense, delay, and uncertainty of result of an appeal or new trial. Nevertheless, if a party found liable to pay damages appeals the judgment resulting from the other party's accepting such reduced damages, this objective has been negatived. When plaintiff is forced to undergo an appeal by the action of an opposing party, after plaintiff has accepted judgment for such reduced damages, it seems unfair to prevent his having a review of the trial court's determination leading to the reduction in damages, especially if plaintiff has accepted same only to avoid the delay and expense attending an appeal . . ."

Or as put by Judge Smith in his concurring opinion in *Best v. Fred Weber Construction Co.*, 525 S.W.2d 102, 108–09 (Mo. App. 1975) from the plaintiff's standpoint:
" . . . Plaintiffs, on the other hand, have gained little or nothing from accepting the remittitur, which acceptance may well have been based upon a desire to receive the judgment expeditiously."

The unfairness mentioned by the Wisconsin court and Judge Smith does not depend on whether defendant does or does not seek a further reduction in the appellate court. The unfairness is there either way. While I agree with Judge Finch that "[t]he remittitur practice was never intended to serve as a complete answer to all objections raised by a defendant in a motion for new trial after plaintiff has obtained a verdict", this does not meet the unfairness issue. When a conditional remittitur is ordered, plaintiff has only a Hobson's choice—take that or else acquiesce in a new trial (which is exactly what defendant has prayed for) or appeal on the ground that the trial court erred in reducing the verdict [(usually quite fruitless, as the standard of review applied to the question is that the reviewing court looks at the evidence in the light most favorable to the remittitur, which means the evidence favorable to defendant's, not plaintiff's position. See these cases for example where plaintiff refused to remit and was unsuccessful on appeal: *Wilhelm v. Haemmerle*, Mo., 262 S.W.2d 609, 612–13 (1953); *Wicker v. Knox Glass Associates, Inc.*, 362 Mo. 614, 242 S.W.2d 566, 569 (1951), and *Steuernagel v. St. Louis Public Service Co.*, 361 Mo. 1066, 238 S.W.2d 426, 431 (banc 1951)]. However, when defendant appeals after a conditional remittitur, defendant is given a much more attractive choice: the option of whether the remittitur issue is to be kept alive on appeal is entirely up to defendant, even though the action of the trial court in that regard was in his favor. No such option is necessary for justice to be done. Either with or without it, defendant is free to test, by appeal, other reasons why he contends he should have a new trial, such as failure to make a submissible case, error in instructions, error in evidentiary rulings or other trial errors. The option is an unjustified bonus.

With the question being squarely presented to us as to whether we should overrule the rule of the *Carver* and *Webb* cases, I would, as stated at the outset, do away with the rule completely and would permit plaintiff to raise the question on appeal of whether the verdict should be reinstated whenever the defendant takes an appeal after plaintiff has remitted, whether defendant seeks further reduction on appeal or not. I agree, however, with the principal opinion that in this particular case the trial

court did not err in ordering a remittitur of $25,000.